UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL MORENO, et al.,

           Plaintiffs,

    v.

ROSS ISLAND SAND & GRAVEL CO.,
et al.,

           Defendants.

No.  2:13-cv-00691-KJM-KJN

ORDER

        Michael Moreno and his step-son, Jared Mitchell, were injured when their boat struck a dredge pipeline submerged beneath the San Joaquin River.  In this action, Mr. Moreno, Mr. Mitchell, and Jared's mother Deanna Moreno, together "the Morenos," seek damages from Ross Island Sand & Gravel Co., the pipe's owner and operator.  Both the Morenos and Ross Island have moved for summary judgment.  Pls.' Mot. Summ. J. (Pls.' Mot.), ECF No. 94; Def.'s Mot. Summ. J. (Def.'s Mot.), ECF No. 97.  The court held a hearing on March 27, 2015.  William McLaughlin appeared for the Morenos, and Steven Scordalakis and Gregory Dyer appeared for Ross Island.  Having considered the parties' briefing and arguments, the court now GRANTS IN PART the portion of the Morenos' motion it construes as a Rule 39 motion, and DENIES Ross Island's motion.

1          After addressing the parties' requests for judicial notice and evidentiary objections,

2   the court reviews the disputed and undisputed facts and applicable legal standards, then turns to

3   the merits of the parties' motions.

4   I.      REQUESTS FOR JUDICIAL NOTICE

5          Both sides have filed requests for judicial notice.  Ross Island requests the court

6   take judicial notice of three documents: the Local Notice to Mariners issued by the Coast Guard

7   on September 28, 2011, the day before the accident; the award of a contract to Ross Island by the

8   Army Corps of Engineers; and the notice of the U.S. Coast Guard's issuance of an anchor waiver

9   to Ross Island.  *See* Def.'s Req. J. Not., ECF No. 97-2.  The Morenos opposed none of these

10   requests.

11          The Morenos request the court take judicial notice of several documents and other

12   information:  navigation rules posted on the U.S. Coast Guard's website; illustrations of day

13   shapes from the Coast Guard's website; nautical safety guides published by the Coast Guard and

14   available on its website; nautical safety guides published by the State of California and available

15   on state websites; a boating exam and boat operator's course from proprietary websites; a copy of

16   the docket for the state case before removal; a copy of the first amended complaint in this case

17   and Ross Island's answer to that complaint; and the dismissal of all defendants but Ross Island

18   from this action.  *See* Pls.' Requests, ECF Nos. 95, 102.  Ross Island objects as to the federal and

19   state nautical safety guides and the proprietary boating exam and safety courses.  Def.'s Resp.

20   Pl.'s Stmt. (Pls.' UMF) no. 28, ECF No. 98-4.  Except to argue the proprietary guides are

21   "excerpts from a private company not readily verifiable," and that the safety guides are irrelevant

22   or lack foundation, Ross Island does not detail its objections.  *Id.*

23   A.     Legal Standard

24          Federal Rule of Evidence 201 governs requests for judicial notice: "The court may

25   judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known

26   within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined

27   from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  A request

28   for judicial notice must normally describe both the matter for which the party seeks judicial notice

and the basis for judicial notice, that is, why the matter's accuracy is not subject to reasonable dispute. *See id.* R. 201(c)(2). The party who requests judicial notice bears the burden of persuasion to show the matter in question meets the description of Rule 201. *Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 272 F.R.D. 505, 516 (E.D. Cal. 2011).

Usually a fact must be established through the introduction of evidence, "ordinarily consisting of the testimony of witnesses." Fed. R. Evid. 201, advisory comm. notes (1972). "Judicial notice is an adjudicative device that alleviates the parties' evidentiary duties at trial." *York v. Am. Tel. & Tel. Co.*, 95 F.3d 948, 958 (10th Cir. 1996). It is a shortcut past the "'heavy-footed common law system of proof by witnesses and authenticated documents'" for facts beyond any reasonable dispute. *Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F.3d 312, 322 (1st Cir. 2004) (Lipez, J., concurring) (quoting John W. Strong, *McCormick on Evidence* § 335 (5th ed. 1999)). While a court may take judicial notice of its own records, judicial notice is redundant if the matter in question is already in the record. *See Silvas v. G.E. Money Bank*, 449 F. App'x 641, 645 n.2 (9th Cir. 2011). For example, the court need not take judicial notice of the complaint or its prior order in the same case. *Ortega v. Univ. of Pac.*, No. 13-1426, 2013 WL 6054447, at *3 (E.D. Cal. Nov. 15, 2013); *Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*, 935 F. Supp. 2d 968, 979 (E.D. Cal. 2013); *see also Newman*, 272 F.R.D. at 516.

At summary judgment, judicial notice obviates the fact-proving procedure of Rule 56, allowing a party to argue for a decision in its favor as a matter of law based on the noticed fact. *See State Farm Fire & Cas. Co. v. Westchester Inv. Co.*, 721 F. Supp. 1165, 1166 (C.D. Cal. 1989). But requests for judicial notice are not affidavits. A request for judicial notice must show the court a matter is not subject to reasonable dispute. Fed. R. Civ. P. 201(b). An affidavit submitted with a motion for summary judgment, however, allows a party to show a fact is or is not genuinely disputed. *See* Fed. R. Civ. P. 56(a), (c).

Some matters are common subjects of judicial notice, including entries in the federal register, *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1179 (9th Cir. 2002); other matters of public record, *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001);

1  pleadings and orders in related proceedings, *see Biggs v. Terhune*, 334 F.3d 910, 915 n.3 (9th Cir.

2  2003), *overruled on other grounds*, *Hayward v. Marshall*, 603 F.3d 546, 555 (9th Cir. 2010) (en

3  banc); *Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290 n.1 (9th Cir. 1996); and

4  documents published on government websites, *Natural Res. Def. Council v. Kempthorne*,

5  539 F. Supp. 2d 1155, 1167 (E.D. Cal. 2008).  As relevant here, the Coast Guard's internet

6  publications also are examples of documents subject to judicial notice.  *See Spottiswoode v. Son*,

7  593 F. Supp. 2d 347, 350 (D. Mass. 2009); *see also Parker v. Lester*, 141 F. Supp. 519, 519 (N.D.

8  Cal.) (Coast Guard regulations are "judicially noticeable"), *aff'd*, 235 F.2d 787 (9th Cir. 1956);

9  *Sadowski v. The Gremlin*, 147 F. Supp. 869, 874 (D. Md. 1957) (same), *modified on other*

10  *grounds sub nom. Curtis Bay Towing Co. v. Sadowski*, 247 F.2d 422 (4th Cir. 1957).

11        If a matter is not judicially noticeable, a party may resort to several alternatives.  If

12  the matter is already within the record or is a persuasive or controlling authority, a simple citation

13  may suffice.  Or if the matter is recent, relevant decisional authority, a notice of supplemental

14  authority may be appropriate.  *See Jacquett v. Sisto*, No. 06-2938, 2008 WL 1339362, at *2 (E.D.

15  Cal. Apr. 9, 2008).  And as noted above, at summary judgment, a party may also "cit[e] to

16  particular parts of materials in the record" by "affidavit or declaration . . . on personal knowledge,

17  set[ting] out facts that would be admissible in evidence, . . . show[ing] that the affiant or declarant

18  is competent to testify on the matters stated." Fed. R. Civ. P. 56(c).  Attachment of evidence to

19  an affidavit or sworn declaration may therefore be more appropriate.  Finally, if a matter is truly

20  subject to no reasonable dispute, the parties may likely stipulate to an assumption of its accuracy

21  or truth.  *See Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v.*

22  *Martinez*, 561 U.S. 661, 676 (2010).

23        B.        Analysis

24        Without taking judicial notice, the court may consider the original complaint, the

25  United States' notice of removal, the first amended complaint, Ross Island's answer, and the

26  other defendants' dismissals.  Those matters are already part of the record.  *See* ECF Nos. 1, 1-1,

27  23, 32, 35, 45, 58, 89.

28

1    Ross Island's request for judicial notice of the Coast Guard's notice to mariners is

2    granted.  As described in Ross Island's request, that notice is one of many published weekly, or

3    more frequently, as provided by federal regulation.  *See* 33 C.F.R. § 72.01-5.  Ross Island also

4    requests the court judicially notice its award of contract with the Army Corps of Engineers and an

5    anchor waiver issued by the Coast Guard.  *See* Def.'s Request ¶¶ 2–3.  Because the contract and

6    anchor waiver are attached to the sworn declaration of Ross Island's Executive Vice President

7    and General Manager, who asserts personal knowledge of their origins, the court will consider

8    them here as appropriate on summary judgment, without the need for judicial notice.  *See* Steed

9    Decl. ¶¶ 1–4, ECF No. 97-1; Fed. R. Civ. P. 56(c); *see also Las Vegas Sands, LLC v. Nehme*, 632

10   F.3d 526, 533 (9th Cir. 2011) (allowing authentication of documents on summary judgment by

11   review of their contents).  Moreover, because the Morenos raise no dispute of fact related to these

12   documents, the court finds they are undisputed for purposes of these motions.

13   The court denies the Morenos' request as to the documents published on

14   www.boaterexam.com and www.boatcourse.com.  Plaintiffs have provided no explanation of why

15   these sources meet the requirements of Rule 201, and the URLs provided do not lead to the

16   documents filed.  The remainder of the Morenos' requests is a list of documents published on

17   federal and California websites.  The court agrees there can be no reasonable dispute that (a) the

18   federal or California government published them, as the case may be, and (b) these documents'

19   contents are as listed.  By taking judicial notice of these documents, the court does not assume

20   their entire truth.  *See Missud v. Nevada*, 861 F. Supp. 2d 1044, 1054 (N.D. Cal. 2012), *aff'd*, 520

21   F. App'x 534 (9th Cir. 2013).  Unless the proponent of judicial notice carries its burden under

22   Rule 201 to explain why a document's content is indisputably accurate, the noticed paper simply

23   "says what it says."  *Jacquett*, 2008 WL 1339362, at *1.

24   II.    EVIDENTIARY OBJECTIONS

25   In general, evidence presented with a motion for summary judgment must be

26   admissible.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  At this stage, however,

27   the evidence's propriety depends not on its form, but on its content.  *Celotex Corp. v. Catrett*,

28   477 U.S. 317, 324 (1986); *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001).

5

1  The party seeking admission of evidence "bears the burden of proof of admissibility." *Pfingston*

2  *v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002).  If the opposing party objects to the

3  proposed evidence, the party seeking admission must direct the district court to "authenticating

4  documents, deposition testimony bearing on attribution, hearsay exceptions and exemptions, or

5  other evidentiary principles under which the evidence in question could be deemed admissible

6  . . . ." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385–86 (9th Cir. 2010).  Courts are

7  sometimes "much more lenient" with the affidavits and documents of the party opposing

8  summary judgment.  *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

9          Both parties have made evidentiary objections.

10  A.     The Morenos' Objections

11          Ross Island relies on testimony offered by Wes Dodd, whom it previously

12  designated and disclosed as an expert witness.  Def.'s Supp. Disclosure, ECF No. 78.  The

13  Morenos move to strike several statements in Dodd's declaration.  The court first describes the

14  statements in question, the addresses each objection.

15          1.     Wes Dodd Declaration

16          The Morenos argue each of the statements reproduced below is inadmissible.  Pls.'

17  Obj. 2–3, ECF No. 100-2.  First:

18          [T]he Dredging Company must provide a Standard of Care to the
           boating public.  They must provide mooring buoys in the area they
19          are dredging and be in compliance with the United States Coast
           Guard.
20

21  Def.'s Supp. Disclosure Ex. A, at 1.  The Morenos raise no specific objection of than to argue that

22  this statement is unsworn and constitutes inadmissible hearsay.  Pls.' Obj. 2.

23          Second:

24          Ross Island Sand and Gravel Company met the standard of care in
           providing safety by marking the area they were dredging with 6
25          steel barges, each having 4 sided 5 MPH signs in the area.  They
           also had two chase boats with one who attempted to warn Mr.
26          Moreno by using his strobe light, sounding his horn and waving an
           orange flag. . . . The dredger also displayed Day Shapes as required.
27

28

Def.'s Supp. Disclosure Ex. A, at 2.  The Morenos argue this statement is unsworn, constitutes inadmissible hearsay, lacks foundation, and is not based on personal knowledge.  Pls.' Obj. 2.

> Third:

> Had Mr. Moreno maintained a proper lookout, he would have seen the safety barges with the 5 MPH signs and cut his speed to 5 MPH. . . . Had Mr. Moreno had a proper lookout, the barges and signs were visible and he should have cut his speed to five miles per hour.

Def.'s Supp. Disclosure Ex. A, at 3.  The Morenos argue this statement is unsworn, constitutes inadmissible hearsay, lacks foundation, and that Mr. Dodd does not have personal knowledge that the dredge pipe was visible.  Pls.' Obj. 2–3.  They also object that Mr. Dodd is not an expert on visibility.  *Id.*

> Fourth:

> Based upon his admission, Michael Moreno was traveling at 45–50 miles [per hour] and entered the area [when] Ross Island was in the process of moving its dredge pipe.  The area was clearly marked by six safety barges with 5MPH signs.

Def.'s Supp. Disclosure Ex. A, at 5.  The Morenos argue this statement is unsworn, constitutes inadmissible hearsay, lacks foundation, and that Mr. Dodd lacks personal knowledge that the area was clearly marked by six safety barges, they and object that Mr. Dodd is not an expert on visibility.  Pls.' Obj. 3 (citing *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412 (9th Cir. 1995)).

> Fifth:

> [B]y not seeing the 5MPH signs, Michael Moreno did not slow down.  His speed was unsafe and it contributed to the magnitude of the collision.

Def.'s Supp. Disclosure Ex. A, at 5.  The Morenos argue this statement is unsworn, constitutes inadmissible hearsay, lacks foundation, and that Mr. Dodd does not have personal knowledge Mr. Moreno's "speed was unsafe" or that the boat's speed "contributed to the magnitude of the collision."  They generally object to Mr. Dodd's lack of expertise on these questions as well.  Pls.' Obj. 3.

1          2.      Unsworn Statements

2              First, the Morenos argue Mr. Dodd's statements are inadmissible at this stage

3  because they are unsworn.  An initially unsworn statement may be considered at summary

4  judgment if it is later affirmed under oath.  *See, e.g.*, *DG & G, Inc. v. FlexSol Packaging Corp. of*

5  *Pompano Beach*, 576 F.3d 820, 825–26 (8th Cir. 2009) (collecting cases); *see also Irise v. Axure*

6  *Software Solutions, Inc.*, No. 08-03601, 2009 WL 3615075, at *11 n.5 (C.D. Cal. Sept. 11, 2009)

7  (overruling a similar objection made in light of a later declaration affirming the expert could

8  testify competently to the truth of the statements in his report).  A district court has discretion to

9  permit a litigant to supplement the summary judgment record.  *See Betz v. Trainer Wortham &*

10  *Co.*, 610 F.3d 1169, 1171 (9th Cir. 2010); *Doremus v. United States*, 793 F. Supp. 942, 948

11  (D. Idaho 1992); *see also* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion

12  of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the

13  court may: (1) give an opportunity to properly support or address the fact; . . . or (4) issue any

14  other appropriate order.")  The court declines to exclude Mr. Dodd's statements for this technical

15  shortcoming and instead allows Ross Island to file the requisite curative affirmation within seven

16  days.[1]

17          3.      Hearsay

18              Second, the Morenos object that Mr. Dodd's statements are inadmissible hearsay.

19  Hearsay objections are often premature at summary judgment when asserted by a moving party.

20  Without doubt, should the court grant a motion for summary judgment, it must do so on the basis

21  of admissible evidence.  *See, e.g.*, *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d

22  1365, 1369 (D.C. Cir. 2000) ("Verdicts cannot rest on inadmissible evidence.").  But a party

23  opposing a motion for summary judgment seeks a trial, not a verdict, and it stands to reason that

24  if evidence may be converted to admissible form for trial, it should not be excluded at summary

---

[1] Even were the court to disregard Mr. Dodd's report, the factual disputes and other outstanding questions of reasonableness described below prevent summary judgment as to either party's liability.  *See infra* sections V.B. and V.C.  However, Mr. Dodd's statements are not relevant to the propriety of a jury trial and the court does not consider them in resolving that aspect of the motions.

1    judgment.  *See Fraser*, 342 F.3d at 1036 (declining to exclude hearsay statements because in

2    alternate form the testimony could be admitted at trial); *Hatcher v. Cnty. of Alameda*, No. 09-

3    1650, 2011 WL 1225790, at \*3 (N.D. Cal. Mar. 31, 2011) (same).  Because Mr. Dodd may offer

4    his opinions at trial, and because, if an expert, he may rely on inadmissible evidence "[i]f experts

5    in the particular field would reasonably rely on those kinds of facts or data in forming an opinion

6    on the subject," Fed. R. Evid. 703, the hearsay objection is overruled for purposes of the pending

7    motions.

8                    4.       Personal Knowledge, Opinion, and Foundation

9            Third, the Morenos object that Mr. Dodd's statements are made without personal

10   knowledge, are provided without adequate foundation, or are otherwise improper opinions.  A

11   witness may offer opinions not based on personal knowledge or observations if qualified as an

12   expert.  *See id.* R. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993).  Experts

13   are those "qualified . . . by knowledge, skill, experience, training, or education" and may offer

14   their opinions if "(a) the expert's . . . specialized knowledge will help the trier of fact to

15   understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient

16   facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the

17   expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

18           A district judge plays a "gatekeeping" role to ensure all expert testimony, scientific

19   or otherwise, is both relevant and reliable.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49

20   (1999).  Expert testimony must be "properly grounded, well-reasoned, and not speculative."

21   *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (quoting Fed. R. Evid. 702

22   advisory comm. note (2000)).  "In sum, the trial court must assure that the expert testimony 'both

23   rests on a reliable foundation and is relevant to the task at hand.'"  *Primiano v. Cook*, 598 F.3d

24   558, 564 (9th Cir. 2010) (quoting *Daubert*, 509 U.S. at 597).  Whether expert testimony is

25   admitted is a matter of discretion.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).  The

26   court may fulfill this gatekeeping role with a dedicated hearing allowing for voir dire of the

27   expert, or without a hearing at all.  *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1138

28   (9th Cir. 2002).

1     On summary judgment, the court should take caution not to confuse the purposes

2     of Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 56.  *Stilwell v. Smith &*

3     *Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007).  Expert testimony should not be excluded

4     "simply because the court can, at the time of summary judgment, determine that the testimony

5     does not result in a triable issue of fact.  Rather the court must determine whether there is 'a link

6     between the expert's testimony and the matter to be proved.'"  *Id.* (quoting *United States v.*

7     *Bighead*, 128 F.3d 1329, 1335 (9th Cir. 1997)).

8     Here, Mr. Dodd did not observe the crash or river on September 29, 2011, and his

9     opinion is not based on his personal knowledge or observations; however, Ross Island offers his

10    testimony as expert testimony.  If his testimony and qualifications satisfy the constraints of

11    Rule 702, his opinions are admissible and may be considered here as evidence.  As noted, under

12    *Daubert*, Ross Island bears the burden to show, by a preponderance of the evidence, that (a) Mr.

13    Dodd is qualified as an expert based on his expertise or other specialized knowledge; (b) his

14    proposed testimony would be helpful to the trier of fact; (c) this testimony is based on sufficient

15    facts or data; and (d) he arrived at his conclusions after reliable application of reliable principles

16    and methods.  *See* Fed. R. Evid. 702.

17                        a)      Specialized Knowledge

18    At hearing, the Morenos' counsel clarified they do not challenge Mr. Dodd's

19    qualifications at this time.  The court concludes Mr. Dodd is qualified.  Rule 702's conception of

20    expert qualification is broad.  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015

21    (9th Cir. 2004).  In some fields experience alone may qualify an expert.  *Id.* (citing Fed. R. Evid.

22    702, advisory comm. note (2000)).  The Rule looks only for a "minimal foundation of knowledge,

23    skill, and experience."  *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994).

24    Because the expert must be qualified to offer "helpful" testimony, the question of qualification is

25    case-specific.  *See* Fed. R. Evid. 702; *cf.*, *e.g.*, *United States v. Chang*, 207 F.3d 1169, 1173 (9th

26    Cir. 2000) (an international finance expert was not qualified to testify about whether a foreign

27    security was counterfeit).

28

10

1    Here, Dodd is a retired member of the Contra Costa County Sheriff's Office and

2    was assigned to the Marine Patrol unit for seventeen years.  Def.'s Supp. Disclosure Ex. A, at 7.

3    His experience includes more than 16,000 hours on the water and investigations of more than 625

4    boating and watercraft accidents.  *Id.*  He is the lead instructor of boating accident and

5    investigation courses for the California Department of Boating and Waterways.  *Id.*  He has

6    participated in and witnessed more than 125 staged boating and watercraft collisions conducted at

7    speeds of up to fifty-five miles per hour.  *Id.*  This experience qualifies him generally as an expert

8    on, for example, boating accidents, their causes, how accidents may be avoided, what a boater

9    may do or expect in certain circumstances and with certain information, and what precautions, in

10   his experience, would suffice to communicate the existence of a particular hazard.

11                    b)        Helpful to the Trier of Fact

12                    Rule 702 allows expert testimony if it "will help the trier of fact to understand the

13   evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  Expert testimony is helpful

14   "when it provides information beyond the common knowledge of the trier of fact."  *United States*

15   *v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002).  Expert testimony may also embrace the ultimate

16   issue.  Fed. R. Evid. 704(a).  On the other hand, the trier of fact, not the expert, is charged with

17   drawing inferences from the evidence.  *Siring v. Oregon State Bd. of Higher Educ. ex rel. E.*

18   *Oregon Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013).  Neither should expert testimony

19   "infringe[] on the jury's province to determine credibility."  *Bighead*, 128 F.3d at 1331.

20   Similarly, legal conclusions are not normally "helpful" and should be excluded.  *See Nationwide*

21   *Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008).  Experts may use legal

22   terminology, *id.* at 1059, but may not "usurp the court's role" of defining the applicable law.

23   *Hangarter*, 373 F.3d at 1017.

24                    Here, in many respects, Mr. Dodd's opinions are admissible because they provide

25   information beyond a lay fact-finder's common knowledge.  Mr. Dodd's expertise may help the

26   trier of fact understand, for example, what message Ross Island's six safety barges would have

27   communicated to a boater; how day shapes are displayed or understood; what a safe speed was on

28   the relevant stretch of the San Joaquin River; what actions a "proper lookout" undertakes; what

11

1   obstructions a "proper lookout" would perceive; and what effects a change in speed could have on

2   the accident's severity.  At the same time, Mr. Dodd's opinions should not instruct the finder of

3   fact on the applicable law, so he may not testify that Ross Island owed a particular standard of

4   care or what that standard was.  Although he may draw on experience and specialized knowledge

5   to estimate what speed the Morenos' boat was traveling, he may not merely buttress lay testimony

6   that Michael Moreno was travelling at a certain speed.  Neither may Mr. Dodd's opinions make

7   inferences on behalf of the finder of fact.  In sum, his opinions are inadmissible to the extent they

8   conclude that Ross Island complied with its legal duty; that Michael and Jared did or did not see

9   Ross Island's safety precautions; and that Michael and Jared were at fault.  These opinions "do

10  nothing more" for a finder of fact "than tell it what verdict to reach."  29 Wright & Gold, *Federal*

11  *Practice & Procedure: Evidence* § 6264 (1st ed. 1997).

12                                    c)       Facts or Data Relied On

13              An expert's opinion must be based on "sufficient facts or data."  Fed. R. Evid.

14  702(b).  Here, the Morenos do not challenge the sufficiency of Dodd's facts and data, and the

15  court finds his opinions were based on sufficient facts and data: deposition transcripts of

16  witnesses and dredge operators, exhibits to those depositions, photographs of the river and

17  accident scene, accident reports prepared by sheriffs' deputies, and the Federal Navigation Rules,

18  *see infra* section V.B.

19              The Morenos do challenge the admissibility of the facts and data Dodd relied on.

20  An expert may form opinions based on facts and data he or she has not personally observed and

21  about which he or she lacks first-hand knowledge.  *See id.* R. 703.  The facts and data relied on

22  need not even be admissible "[i]f experts in the particular field would reasonably rely on those

23  kinds of facts or data in forming an opinion on the subject."  *Id.*  Although "[t]here has been much

24  written in this circuit on what type of outside [*i.e.*, inadmissible] evidence a particular expert

25  would reasonably rely upon," *Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058, 1061 (9th

26  Cir. 2003), this is not a challenging case on that front.  Maritime accident experts may reasonably

27  be expected to rely on the testimony of witnesses, photographs of the scene and the Morenos'

28

1   damaged boat, the reports of law enforcement officers who investigated the accident, and similar

2   evidence.  The Morenos do not argue otherwise.

3          The Supreme Court has held that the Federal Rules' "liberal thrust" embodies a

4   "general approach of relaxing the traditional barriers to opinion testimony."  *Daubert*, 509 U.S. at

5   588–89 (citation and quotation marks omitted).  Should the expert's facts and data be

6   inadmissible but of the type reasonably relied on by others in the field, a superior remedy is to

7   prevent the expert from disclosing the underlying evidence instead of his opinion in total.  *See*

8   *United States v. W.R. Grace*, 504 F.3d 745, 761 (9th Cir. 2007).  Because Mr. Dodd's opinions

9   were formed on the basis of facts and data similar experts in his field may have reasonably relied

10  upon, his opinions are admissible even though the facts or data themselves are not.

11                 d)      Reliable Methods and Application

12         The Morenos do not challenge the reliability of Dodd's methods or his application

13  of those methods.  The court concludes his report describes a reliable consideration and

14  application of his experience to the evidence here.

15                 e)      Summary

16         Dodd's experience qualifies him to offer expert opinion on, for example, boating

17  accidents, their causes, how accidents may be avoided, what a boater may do or expect in certain

18  circumstances and with certain information, and what precautions, in his experience, would

19  suffice to warn of a particular hazard.  The court considers Dodd's testimony here for those

20  purposes.  Otherwise, the objections are sustained in part as to (1) testimony Ross Island owed a

21  particular standard of care or what that standard was; (2) testimony Ross Island complied with its

22  legal duty; (3) testimony of Michael Moreno's speed; (4) testimony Michael and Jared did or did

23  not see Ross Island's safety precautions; (5) testimony Michael and Jared owed a particular

24  standard of care or what that standard was; and (6) whether Michael and Jared complied with

25  their legal duties.

26      B.      Ross Island's Objections

27         First, Ross Island objects that several of the Morenos' requests for judicial notice

28  refer to irrelevant information or that the documents lack foundation.  To the extent the court has

1    denied the requests for judicial notice above, Ross Island's objections are moot.  Otherwise the

2    objections are overruled.  Ross Island does not explain how the government publications lack

3    foundation, and the court has judicially noticed their official publication.  As to relevance, the

4    moving papers themselves, not separate tables of objections, are the correct mode of objection.

5    *Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).  Rule 56

6    expressly seeks out genuine disputes of material facts, not immaterial facts.  If evidence is

7    irrelevant, a party seeking summary judgment should describe this irrelevance directly as grounds

8    for summary judgment in its favor.  *See Celotex*, 477 U.S. at 323, 325 (requiring a movant

9    "inform[] the district court of the basis for its motion" and show "there is an absence of evidence

10   to support the nonmoving party's case").

11           Second, Ross Island objects to the Morenos' use of the phrase "severe physical

12   injuries."  *See* Pls.' UMF no. 48.  Because no party seeks summary judgment on damages, the

13   court does not reach the question of the extent or nature of Jared's or Michael's injuries.

14           Third, Ross Island objects to the deposition testimony of James and Douglas

15   Baldanzi, that they would have run into the pipe had they not seen Michael and Jared hit it first.

16   *See* Pls.' UMF no 54.  Ross Island's objections here are on the basis of relevance, foundation, and

17   that the Baldanzis' statements are improper lay witness opinion, argumentative, and speculative.

18   *See id.*[2]  The objection for irrelevance is overruled.  If the Baldanzis were indeed only prevented

19   from crashing into the pipe because they saw Michael and Jared's boat reach it first, a question

20   for the fact finder, Ross Island's safety precautions are less likely to have been reasonable and

21   adequate.  The remaining objections are really only one, that the Baldanzis can only speculate

22   they would also have hit the pipe.  The objection is overruled for purposes of this order.  The

23   Baldanzis may reasonably rely on their perceptions of their boat's speed and direction to conclude

24   a particular combination of warning signs prevented an accident.  Ross Island will have ample

25   opportunity to undercut the reliability and credibility of this testimony at trial.

26           [2] Ross Island also objects that the statement is argumentative.  Questions may be
     argumentative and answers nonresponsive, but answers are usually not objectionable for being
27   argumentative.  Nevertheless, this objection is essentially the same as the others: that the
     Baldanzis' testimony speculates and is not credible.
28

1    Fourth, Ross Island objects to the statements of Hector Pazos, plaintiffs' expert,

2    that "Ross Island failed to satisfy its duties in terms of marking the dredge pipe and stopping

3    boats approaching the submerged pipeline" and that "Ross Island's failure to use proper safety

4    boats under the circumstances was unreasonable."  As discussed above, *see supra* section A.4.b),

5    legal conclusions clothed as expert testimony are inadmissible.  The court therefore does not rely

6    on these statements here.

7    III.    BACKGROUND

8    Unless otherwise noted, the following facts are either assumed true by virtue of the

9    parties' stipulation, *see* Stip. Adm. Facts (Stip.), ECF No. 97-16, or are not disputed, *see* Pls.'

10   UMF; Pls.' Stmt. Opp'n (Def.'s UMF), ECF No. 100-1.

11   At 7:30 on the morning of September 29, 2011, Michael and Jared, who was

12   sixteen years old at the time, went fishing on the San Joaquin River.  Stip. ¶ 1.  They traveled

13   west along the river's northern side.  *Id.* ¶ 3.  The parties have offered contradictory evidence of

14   the weather, visibility, water conditions, and how heavy boat traffic was that morning.  *See* Pls.'

15   UMF no. 37; M. Moreno Dep. 174:9–17; Mitchell Dep. 145:20–24; D. Bandanzi Dep. 18:11–19,

16   22:8–13; J. Baldanzi Dep. 64:14–19; Wilson Dep. 27:14–16, 28:14–23, 49:19–21.  They do agree

17   the tide was going out.  Stip. ¶ 4.[3]  Boat traffic is not subject to a posted speed limit where

18   Michael and Jared entered the river, *id.* ¶ 5, and in Michael's Ranger Z-21 bass fishing boat, they

19   reached at least forty-five miles per hour, *id.* ¶ 2; *see* Pls.' UMF no. 40 (citations to various

20   testimony estimating a speed of between 45 and 70 miles per hour).  Michael testified in

21   deposition that he and Jared were talking, that he was looking forward, and that he maintained

22   what he considered an appropriate speed for the weather and visibility conditions that day.  Def.'s

23   UMF nos. 54, 55.

24   The same day, down the river ahead of Michael and Jared, Ross Island had

25   anchored a dredge vessel near the river's south side near channel marker 19.  Stip. ¶¶ 7–8.  A

26   twenty-inch-wide, 6,000-foot-long dredge pipe traced a serpentine route from the vessel across

---

27   [3] At hearing, the parties also specifically confirmed the court may take judicial notice that

28   the San Joaquin River is open to the Pacific Ocean and is subject to the ebb and flow of the tides.

the river to its northern shore.  *Id.* ¶ 9.  At that point, the San Joaquin River is nearly 4,000 feet wide.  *Id.*  As it was required to do, Ross Island had filed an Application to Anchor Outside Designated Anchorages with the United States Coast Guard.  *Id.* ¶ 10; *id.* Ex. 1.  It had also deployed two skiffs to monitor boat traffic both upriver and down current from the dredge vessel and pipe.  *Id.* ¶ 12.  Lucas Wilson, a Ross Island employee, *id.* ¶ 11, was monitoring traffic east (upriver) of the dredge pipe on one of the skiffs, *id.* ¶ 14.  His skiff was equipped with a handheld radio, orange flag, handheld air horn, and an amber-colored light on its mast.  *Id.* ¶ 13.  The dredge vessel displayed the physical signals (day shapes) described by Federal Inland Rule of Navigation No. 27 above its third deck, *id.* ¶ 15; 33 C.F.R. § 83.27(d),[4] and displayed at its stern a black and white arrow sign pointing toward its port side, *id.* ¶ 16; *id.* Ex. 2, photo nos. 37, 39, ECF No. 97-17.  The Morenos agree the shapes displayed were those required by Federal Inland Rule of Navigation No. 27, but argue that in light of the circumstances of the dredging operation, the day shapes were an inadequate warning.  *See* Def.'s UMF no. 7.

       Dan Lukoszyk, a Ross Island employee, was in the dredge vessel.  Stip. ¶ 11; Pls.' UMF no. 15.  Ross Island had anchored six yellow steel barges in that part of the river, each measuring eight feet wide and sixteen feet long and displaying a four-foot by eight-foot "5 mph" sign.  Stip. ¶¶ 17–18.  It had also deployed buoys, each about three feet in diameter, two-and-a-half feet tall, and painted white.  Def.'s UMF no. 13.  The evidence remains unclear whether the barges and buoys accurately marked the pipe's location, *see id.* no. 12; Steed Dep. 53:7–54:24; Lukoszyk Dep. 41:2–15; 87:3–18; Wilson Dep. 31:3–25, or whether they were "clearly visible" that day, *see* Def.'s UMF no. 14; McGary Dep. 30:15–21; M. Moreno Dep. 175:19–22; Mitchell Dep. 148:20–149:1; J. Baldanzi. Dep. 46:6–14; D. Baldanzi Dep. 61:8–62:6.

---

[4] This subsection provides, "A vessel engaged in dredging or underwater operations, when restricted in her ability to maneuver, shall exhibit the lights and shapes prescribed in [33 C.F.R. § 83.27(b)(i)–(iii)] and shall in addition, when an obstruction exists, exhibit (i) Two all-round red lights or two balls in a vertical line to indicate the side on which the obstruction exists; (ii) Two all-round green lights or two diamonds in a vertical line to indicate the side on which another vessel may pass; and (iii) When at anchor, the lights or shapes prescribed by this paragraph, instead of the lights or shape prescribed in [33 C.F.R. § 83.30]."

At about 7:40 a.m., Ross Island stopped dredging so it could move 2,000 feet of the dredge pipe to the west (down current) about 800 to 1,000 feet.  Stip. ¶ 20.  Normally the pipe was anchored to the channel bottom to keep it from drifting with the tide.  Def.'s UMF no. 15.  Although it appears undisputed the pipe was anchored at the time of the accident, at least at certain points, Lukoszyk Dep. 28:13–15, it remains unclear whether a portion of the pipe floated and whether Ross Island intended for one or another portion or even all of the pipe to float.  *See* Def.'s UMF no. 17; Pls.' UMF nos. 6–7; Wilson Dep. 18:20–24, 20:4–7, 21:10–25.  Generally the parties agree that to move the pipe, Ross Island would remove the anchors and pump sediment from it, causing the pipe to float just below the surface and drift down current.  Pls.' UMF nos. 7–8.  The Morenos argue that just before the accident the north side of the pipeline had floated to within twelve inches of the water's surface.  *Id.* no. 9; Pls.' Mot. 2.  Ross Island argues the evidence does not support this characterization of the record.  *See* Pls.' UMF no. 9.

From the top of the dredge, Lukoszyk saw Michael Moreno and Jared Mitchell when they were about 3,000 or 4,000 feet from the dredge and 700 feet from the pipeline.  Pls.' UMF no. 43.  Lukoszyk radioed Wilson on the skiff and told him to pursue Michael's boat, but Wilson would not reach the boat before it struck the pipe.  *Id.* nos. 44, 45.  Ross Island cites evidence that Lucoszyk sounded the dredge's horn and that Wilson waved his flag, activated his light, and sounded his own horn from the skiff.  Def.'s UMF nos. 32–33.  Michael and Jared testified to the contrary in their depositions.  *Id.*; M. Moreno Dep. 175:19–22; Mitchell Dep. 148:20–25.  Whether or not these warnings were given, Michael did not see or hear them, and he saw no yellow barges or day shapes.  Def.'s UMF no. 34.  He did see what he believed was "tule"[5] in the water, but did not expect it to be hard.  *Id.* no. 37.  When he saw the pipe, he braced for impact rather than attempting a turn.  *Id.* no. 36.  The boat's outboard motor struck the pipe, flipped into the boat, and caused injuries to Michael and Jared.  *Id.* no. 35; Pls.' UMF nos. 46, 48.

---

[5] It appears this was a reference to *Schoenoplectus acutus* or *Schoenoplectus californicus*, varieties of wetland flora found in tidal marshes in the San Francisco bay area.  *See, e.g.*, Diana Stralberg, et al., *Predicting Avian Abundance Within and Across Tidal Marshes Using Fine-Scale Vegetation and Geomorphic Metrics*, 3 Wetlands 475, 477 (2010).

1    Before the accident, Michael and Jared had passed another boat operated by James

2    and Douglas Baldanzi.  Stip. ¶ 6.  The Baldanzis heard the skiff's air horn and saw the yellow

3    barges and slowed, Def.'s UMF no. 44, although they mistook the yellow barges for boats, Pls.'

4    UMF no. 51, did not see the submerged pipe, *id.* no. 50, and did not see any warnings on the

5    dredge vessel, *id.* no. 53, or hear its horn, J. Baldanzi Dep. 39:21–41:6.  Although their testimony

6    is ambiguous chronologically and susceptible to credibility and other challenges, the Baldanzis

7    testified they also would have collided with the pipe had they not seen the Morenos strike the

8    pipe.  *See* Pls.' UMF no. 54.  After the Baldanzis saw the accident, they drove toward the Moreno

9    boat, but Wilson arrived and turned them away, directing them south of the dredge.  *Id.* no. 55.

10   When the Baldanzis passed the dredge, its bow was pointed southward.  *Id.* no. 56.

11   A few minutes after Lukoszyk saw the accident, he sank the pipe, believing it to be

12   a hazard and fearing another accident.  *Id.* no. 57; Lukoszyk Dep. 46:11–47:3, 97:20–22.  The

13   dredge shut down, and emergency services soon arrived on the scene.  Def.'s UMF no. 45.  Two

14   Contra Costa County Sheriff's Deputies arrived at the dredge vessel between 10:30 and 11:30

15   a.m. to investigate.  Stip. ¶¶ 21, 22.  They interviewed Wilson and Lukoszyk and took pictures of

16   the scene.  *Id.*  The deputies did not interview the Baldanzis.  *See* Pls.' UMF no. 63.  Neither did

17   they inspect the pipeline.  *Id.* no. 62.  They concluded Mr. Moreno had not maintained a proper

18   lookout or safe speed.  Def.'s UMF nos. 46–48.  Deputies from the Sacramento County Sheriff's

19   Department reached the same conclusion.  *Id.*

20   The Morenos filed a complaint in Sacramento County Superior Court in October

21   2012, alleging negligence claims, including negligent infliction of emotional distress, against

22   Ross Island, the U.S. Coast Guard, the Army Corps of Engineers, Contra Costa County, and

23   Sacramento County, and other statutory claims against all the defendants but Ross Island.

24   Compl., Notice Removal Ex. A, ECF No. 1-1.  The United States removed the action to this court

25   in April 2013, asserting exclusive federal admiralty jurisdiction.  *Id.* ¶ 4, ECF No. 1.  The

26   Morenos amended their complaint in May 2013, First Am. Compl. (FAC), ECF No. 23,

27   acknowledging the court's jurisdiction under 46 U.S.C. § 30906 and 28 U.S.C. § 1333.  FAC

28   ¶ 21.  The amended complaint alleged the same claims, but added the United States as a

1    defendant in each.  Eventually all defendants but Ross Island were dismissed by stipulation.  *See*

2    Minute Orders, ECF Nos. 35, 45, 58, 89.  After the federal defendants were dismissed, the

3    Morenos moved to remand the case to Sacramento County Superior Court, ECF No. 59, but later

4    withdrew that motion and requested the court both retain jurisdiction and refer the matter to its

5    Voluntary Dispute Resolution Program (VDRP), ECF No. 76.

6            After completing a VDRP conference, Ross Island and the Morenos were unable

7    to settle the case, Joint VDRP Completion Report, ECF No. 83, and each moved for summary

8    judgment.  The Morenos assert they are entitled to a jury trial on their negligence claims and

9    argue the undisputed facts show Ross Island is liable.  Pls.' Mot. 1.  They reserve a damages

10   determination for trial.  *Id.*  Ross Island moves for summary judgment in its favor, arguing the

11   undisputed facts show this case must be resolved according to admiralty law and must therefore

12   be tried without a jury, and that the Morenos were at fault and cannot prove the elements of a

13   negligence claim.  Def.'s Mot. 1–2.

14   IV.    LEGAL STANDARD ON SUMMARY JUDGMENT

15           A court must grant a motion for summary judgment in whole or in part, "if the

16   movant shows there is no genuine dispute as to any material fact and the movant is entitled to

17   judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This is a "threshold inquiry" into whether a

18   trial is necessary at all, that is, whether "any genuine factual issues . . . properly can be resolved

19   only by a finder of fact because they may reasonably be resolved in favor of either party."

20   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[6]  The court does not weigh evidence

21   or assess the credibility of witnesses; rather, it determines which facts the parties do not dispute,

22   then draws all inferences and views all evidence in the light most favorable to the nonmoving

23   party.  *See id.* at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88

24   (1986); *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).  "Where the record taken as a

25

26           [6] Rule 56 was amended, effective December 1, 2010; however, it is appropriate to rely on
     cases decided before the amendment took effect, as "[t]he standard for granting summary
27   judgment remains unchanged."  Fed. R. Civ. P. 56, notes of advisory comm. on 2010
     amendments.
28

1   whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

2   issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv.*

3   *Co.*, 391 U.S. 253, 289 (1968)).

4           The moving party bears the initial burden of "informing the district court of the

5   basis for its motion, and identifying those portions of the [record] which it believes demonstrate

6   the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  The burden then shifts

7   to the nonmoving party to "go beyond the pleadings" and "designate specific facts showing that

8   there is a genuine issue for trial." *Id.* (quotation marks omitted).  The nonmoving party "must do

9   more than simply show that there is some metaphysical doubt as to the material facts."

10  *Matsushita*, 475 U.S. at 586.  "Only disputes over facts that might affect the outcome of the suit

11  under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477

12  U.S. at 248.

13          Cross motions for summary judgment are evaluated separately under the same

14  standard described above, "giving the nonmoving party in each instance the benefit of all

15  reasonable inferences." *Am. Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d

16  1092, 1097 (9th Cir. 2003).

17  V.    <u>DISCUSSION</u>

18          The parties' motions lend themselves to resolution in two phases.  First, the

19  Morenos seek summary judgment that they are entitled to a jury trial.  Second, the parties seek

20  summary judgment on the merits of the amended complaint's claims, in their respective favor.

21      A.    <u>Jury Trial</u>

22          As a preliminary matter, a motion for summary judgment is not the vehicle

23  typically used to confirm a jury trial.  Rule 56 contemplates the identification of "each claim or

24  defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R.

25  Civ. P. 56(a).  The right to a jury trial cannot be considered a "claim or defense." Rule 39 is the

26  /////

27  /////

28  /////

1   standard means of resolving jury-trial disputes:

2           When a jury trial has been demanded under Rule 38 . . . [t]he trial
            on all issues so demanded must be by jury unless: . . . the court, on
3           motion or on its own, finds that on some or all of those issues there
            is no federal right to a jury trial.

4
            . . .
5
            Issues on which a jury trial is not properly demanded are to be tried
6           by the court.  But the court may, on motion, order a jury trial on any
            issue for which a jury might have been demanded.
7

8   Fed. R. Civ. P. 39(a)–(b).  Rule 39(a) allows the court to strike a jury demand "on motion or on

9   its own."  But when "a jury trial is not properly demanded," Rule 39(b) speaks only of a motion

10  for a jury trial.  Usually this Rule comes into play when a party has made an untimely jury

11  demand.  *See, e.g.*, *Pac. Fisheries Corp. v. HIH Cas. & Gen. Ins., Ltd.*, 239 F.3d 1000, 1002 (9th

12  Cir. 2001).

13          Here, the first amended complaint includes a timely jury trial demand.  FAC 19,

14  ECF No. 23.  Typically, Ross Island would have been expected to file a motion to strike this

15  demand under Rule 39(a), but the Morenos anticipated that move and sought preemptive

16  resolution by summary judgment.  And Ross Island, rather than moving under Rule 39, has also

17  labeled its motion as one for summary judgment.  Whether a party is entitled to a jury trial in

18  federal court is a question of law, *S.E.C. v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993), and

19  questions of law are the realm of summary judgment, *see* Fed. R. Civ. P. 56(a).  District courts in

20  this circuit have also assumed the jury-trial question is compatible with a motion for summary

21  judgment.  *See Breham v. Asset Acceptance, LLC*, No. 09-1474, 2010 WL 1735147, at *3 (D.

22  Ariz. Apr. 28, 2010) (denying a motion to strike without prejudice to renewal at summary

23  judgment) (citing *MZ Ventures LLC v. Mitsubishi Motor Sales of Am. Inc.*, No. 99-02395, 1999

24  WL 33597219, at *19 (C.D. Cal. Aug. 31, 1999)).  Courts also have considered simultaneous or

25  alternative motions for summary judgment and to strike a jury trial demand.  *See, e.g.*, *Granite

26  Rock Co. v. Int'l Bhd. of Teamsters, Freight, Const., Gen. Drivers, Warehousemen & Helpers,

27  Local 287 (AFL-CIO)*, 402 F. Supp. 2d 1120, 1122 (N.D. Cal. 2005) (companion motions);

28

21

1    *Yonaty v. Amerada Hess Corp.*, No. 04-605, 2005 WL 1460411, at *1 (N.D.N.Y. June 20, 2005)

2    (alternative motions).  The parties did alert the court to their dispute over jury trial rights, and the

3    court's scheduling order anticipated competing motions on the Morenos' right to a jury trial.  *See*

4    Scheduling Order 2:1–5, ECF No. 92.  Rather than delaying resolution out of regard for

5    procedural nicety, the court construes the parties' briefing as Rule 39 motions to strike and

6    preserve the jury demand, respectively.

7            Turning now to the motions' merits, the Seventh Amendment preserves "the right

8    of trial by jury" in "suits at common law."  U.S. Const. amend. VII; *see also* Fed. R. Civ. P.

9    38(a).  But "there is no right to jury trial if general admiralty jurisdiction is invoked."[7]  *Ghotra by*

10   *Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1054 (9th Cir. 1997); *see also* Fed. R. Civ. P.

11   9(h), 38(e).  The Seventh Amendment neither requires nor forbids jury trials in admiralty cases.

12   *Fitzgerald v. U. S. Lines Co.*, 374 U.S. 16, 20 (1963).  These general principles present two

13   questions: first, has this court's admiralty jurisdiction been invoked, and second, if so, are the

14   Morenos nonetheless entitled to a jury trial?

15           1.    Jurisdiction

16           The Morenos filed their original complaint in California state court, alleging

17   common law and California statutory claims for relief.  Compl., Not. Removal Ex. A, ECF No. 1-

18   1.  The United States removed the case to this court on the basis of 46 U.S.C. §§ 30904 and

19   30906, provisions of the Suits in Admiralty Act.  The Suits in Admiralty Act vests federal district

20   courts with exclusive jurisdiction over claims against the United States and its agencies.  *See*

21   *Dearborn v. Mar Ship Operations, Inc.*, 113 F.3d 995, 996–97 (9th Cir. 1997) (interpreting 46

22   U.S.C. § 745, the predecessor of § 30904).

23

24

25

26

27           [7] Courts use the words "admiralty" and "maritime" jurisdiction interchangeably.  *Gruver*
28   *v. Lesman Fisheries Inc.*, 489 F.3d 978, 982 n.5 (9th Cir. 2007).

After removal, the Morenos amended their complaint.  On the amended complaint's first page they purport to name this court's admiralty department,[8] and their jurisdictional allegations cite "the Suits in Admiralty Act," § 30906, and 28 U.S.C. § 1333, FAC ¶ 21.  Section 1333 expressly grants federal district courts exclusive jurisdiction over admiralty claims, "saving to suitors in all cases all other remedies to which they are otherwise entitled."  28 U.S.C. § 1333(1).  Despite the jurisdictional rigmarole, the amended complaint alleges the same four California-law claims as did the original state-court complaint.

The Federal Rules allow a litigant to designate claims within the same pleading as either within the court's admiralty department or another department.  *See* Fed. R. Civ. P. 9(h).  That is, a plaintiff may invoke jurisdiction "on the 'law side' of the court" for her claims at law and the "admiralty side" for her claims in admiralty.  *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.*, 813 F.2d 1553, 1559 (9th Cir. 1987).  In *Trentacosta*, the plaintiff "was careful to invoke federal jurisdiction only under 28 U.S.C. § 1331, and not admiralty jurisdiction" for his maintenance and cure,[9] negligence, and products liability claims.  *Id.*  Therefore the district court did not err when it dismissed the plaintiff's pendent state-law claims after dismissing the federal admiralty claims.  *Id.* at 1560.  Here, the amended complaint makes no such careful distinctions.  It discusses jurisdiction only once: "this Court has subject matter jurisdiction over all claims pursuant to 46 U.S.C. § 30906 and 28 U.S.C. § 1333."  FAC ¶ 21.  The amended complaint invokes this court's admiralty jurisdiction over all its claims.  The jury demand on the complaint's final page does not alter this conclusion.  It is made under "Amendment VII of the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure."  FAC 19, ECF No. 23.  Rule 38(e) conditions its effect on elections of admiralty or maritime jurisdiction under Rule 9(h), and the Seventh Amendment supplies no automatic jury-trial right in admiralty cases.  *See Fitzgerald*, 374 U.S. at 20.

---

[8] The complaint literally invokes the forum as "The United States District Court for the Eastern District of California in Admiralty."

[9] "A claim for maintenance and cure concerns the vessel owner's obligation to provide food, lodging, and medical services to a seaman injured while serving the ship." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001).

1    Writing "in admiralty" on the front of a complaint and citing 28 U.S.C. § 1333

2  does not alone transform any complaint for negligence into an admiralty case, however.  "[A]

3  party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort

4  claim must satisfy conditions both of location and of connection with maritime activity."  *Jerome*

5  *B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).  The first

6  requirement, for location, is met if the tort occurred on navigable water or if an injury suffered on

7  land was caused by a vessel on navigable water.  *Id.*  The second requirement, testing the claim's

8  connection to maritime activity, has two parts.  The incident in question must have a "potentially

9  disruptive impact on maritime commerce," and it must have "a substantial relationship to

10  traditional maritime activity."  *Id.*

11    Here, the Morenos' claims readily satisfy both the location and connection

12  conditions.  First, location: "Throughout the nation's history, tidal waters have been held to be

13  within the definition of 'navigable waters.'  Indeed, until 1851 admiralty jurisdiction was limited

14  to waters 'within the ebb and flow of the tide.'"  *Complaint of Paradise Holdings, Inc.*, 795 F.2d

15  756, 759 (9th Cir. 1986) (quoting *The Steamboat Thomas Jefferson*, 23 U.S. (10 Wheat.) 428, 428

16  (1825)).  The Ninth Circuit has held that a body of water is navigable when "it is open to the

17  Pacific Ocean and subject to the ebb and flow of tides."  *In re Mission Bay Jet Sports, LLC*,

18  570 F.3d 1124, 1127 (9th Cir. 2009).  The San Joaquin River is open to the Pacific Ocean and

19  subject to the ebb and flow of the tides; the parties agree the tide was going out at the time of the

20  accident.

21    Second, a connection to traditional maritime activity: The first part of the

22  connection test goes to "potential effects, not to the particular facts of the incident."  *Grubart*, 513

23  U.S. at 538 (citation and internal quotation marks omitted).  The inquiry focuses "not on the

24  specific facts at hand but on whether the general features of the incident were likely to disrupt

25  commercial activity."  *Id.* (citations and internal quotation marks omitted).  The court must

26  therefore consider the "description of the incident at an intermediate level of possible generality."

27  *Id.*  Admiralty jurisdiction often lies when a vessel strikes an underwater pipeline or other

28  structure.  *See Grubart*, 513 U.S. at 539 (citing *Pennzoil Producing Co. v. Offshore Express, Inc.*,

1   943 F.2d 1465 (5th Cir. 1991); *Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa*, 761 F.2d

2   229, 233 (5th Cir. 1985); and *Orange Beach Water, Sewer, and Fire Protection Authority v. M/V

3   Alva*, 680 F.2d 1374 (11th Cir. 1982)).  Here, the incident may be described, at an "intermediate

4   level of possible generality," as damage to a vessel in navigable water by an underwater structure.

5   Moreover, Ross Island was dredging the deep water shipping channel in the San Joaquin River,

6   and the accident disrupted its dredging activity.  The accident had a disruptive impact on

7   maritime commerce.

8           The second part of the connection test requires "the tortfeasor's activity [to] be 'so

9   closely related to activity traditionally subject to admiralty law that the reasons for applying

10  special admiralty rules would apply.'" *Gruver*, 489 F.3d at 983 (quoting *Grubart*, 513 U.S. at

11  539).  The relevant activity must be characterized generally, "but not so generally as to ignore the

12  maritime context." *Id.* at 986 (citing *Grubart*, 513 U.S. at 541–42).  Not "every tort involving a

13  vessel on navigable waters falls within the scope of admiralty jurisdiction no matter what," but

14  "ordinarily that will be so." *Grubart*, 513 U.S. at 543.  The Ninth Circuit approves the

15  generalization that "virtually every activity involving a vessel on navigable waters" is a

16  "traditional maritime activity sufficient to invoke maritime jurisdiction." *Gruver*, 489 F.3d at 986

17  (quoting *Grubart*, 513 U.S. at 543) (quotation marks omitted).  Here the alleged tort occurred on

18  navigable waters and involved Ross Island's dredging vessel and a bass boat.  This case is within

19  the bounds of traditional maritime activity and the court's admiralty jurisdiction.

20          Finally, the dismissal of every defendant but Ross Island does not meaningfully

21  alter the jurisdictional analysis.  *See* FAC ¶¶ 23–35, 91–95.  The backbone of the amended

22  complaint remains unchanged despite the United States' dismissal, and the complaint expressly

23  invokes this court's admiralty jurisdiction over all its claims.

24                  2.      Jury Trial

25          Trials without juries are the longstanding norm in admiralty cases.  *See* Loren

26  Armstrong, *Holy Moses, Ghotra! In Rem-embrance of Admiralty's Bench Trial*, 14 U.S.F. Mar.

27  L.J. 77, 79 (2002) ("Since at least the mid-1300s, judges sitting without juries have decided

28  admiralty and maritime cases.").  Courts of admiralty were established to adjudicate disputes

between persons "who, on the one hand, may be absent from their homes for long periods of time, and, on the other hand, often have property or credits in other places." *In re Louisville Underwriters*, 134 U.S. 488, 493 (1890). The jurisdiction of the ordinary courts of law and imposition of the jury trial right risked "hinder[ing] or detain[ing] men from their employments" in cases where "delay would often be ruin." *Id.* (citations and quotation marks omitted). Or, in the words of the Eleventh Circuit, "Admiralty law exists because man sails the seas." *Schiffahrtsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. De Navegacion*, 773 F.2d 1528, 1535 (11th Cir. 1985). Because the Seventh Amendment preserves the common law right to a jury trial, and there was no common law right to jury trials in admiralty cases, the Seventh Amendment does not guarantee the right to a jury trial in admiralty cases. *Craig v. Atl. Richfield Co.*, 19 F.3d 472, 475 (9th Cir. 1994).

Section 1333 gives federal courts exclusive jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction," but, as noted above, "sav[es] to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333(1). This section was originally enacted with the Judiciary Act of 1789, "but its substance has remained largely unchanged." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 443–44 (2001). "What the drafters of the Judiciary Act intended in creating the saving to suitors clause is not entirely clear and has been the subject of some debate." *Id.* at 444. In *Lewis*, the Supreme Court traced the development of that clause since 1789 and concluded it "was designed to protect remedies available at common law." *Id.* at 454. "Trial by jury," it found, "is an obvious . . . example of the remedies available to suitors." *Id.* at 454–55.

Federal courts most commonly adjudicate disputes over the right to a jury trial when a complaint includes some claims that must be tried to a jury and others that normally would be tried before a judge. *Fitzgerald v. U. S. Lines*, 374 U.S. 16 (1963), is a representative example. In *Fitzgerald,* the plaintiff alleged three claims: negligence under the Jones Act,[10]

---

[10] "A Jones Act claim is an *in personam* action for a seaman who suffers injury in the course of employment due to negligence of his employer, the vessel owner, or crew members." *Lewis*, 531 U.S. at 441.

1    unseaworthiness,[11] and maintenance and cure.[12]  *Id.* at 17.  The Jones Act expressly requires a

2    jury trial, 46 U.S.C. § 30104, but claims for unseaworthiness and maintenance and cure are

3    traditionally tried without a jury, *Fitzgerald*, 374 U.S. at 17.  All three claims, however, "serve

4    the same purpose of indemnifying a seaman for damages caused by injury, depend in large part

5    upon the same evidence, and involve some identical elements of recovery."  *Id.* at 18.  Trying

6    each claim separately would not only duplicate effort, but present a judge with vexing questions

7    of possible double-recovery.  *See id.* at 19–20.  The Supreme Court held that because "the jury, a

8    time-honored institution in our jurisprudence, is the only tribunal competent under the present

9    congressional enactment to try all the claims . . . a maintenance and cure claim joined with a

10   Jones Act claim must be submitted to the jury when both arise out of one set of facts."  *Id.* at 21.

11          Lower courts, citing *Fitzgerald*, have expanded jury trials into admiralty cases.  In

12   *Ghotra v. Bandila Shipping*, *supra*, the Ninth Circuit held a plaintiff could demand a jury in a

13   mixed-admiralty case.  *See* 113 F.3d at 1054–58.  The complaint alleged common law negligence,

14   gross negligence, negligence under a federal statutory scheme, and an *in rem* admiralty claim

15   against the M/V Gracious, a ship.  *Id.* at 1053.  The complaint invoked the district court's

16   diversity and admiralty jurisdiction and specifically demanded a jury trial, including for the *in*

17   *rem* claim.  *Id.* at 1054.  The district court struck the jury demand and conducted a bench trial, but

18   the Ninth Circuit reversed and remanded the case for a jury trial.  *Id.* at 1058.  The circuit

19   reasoned, "a plaintiff with *in personam* maritime claims has three choices: He may file suit in

20   federal court under the federal court's admiralty jurisdiction, in federal court under diversity

21   jurisdiction if the parties are diverse and the amount in controversy is satisfied, or in state court."

22   *Id.* at 1054.  Because three of the plaintiffs' four claims were "*in personam* maritime claims that

23   could have been brought at common law," and because the parties were diverse, the plaintiffs

24   were entitled to a jury trial on those three claims. *Id.* at 1055 (citation and internal quotation

25   marks omitted).  Furthermore, because all four claims arose "out of the same factual

---

26   [11] "Unseaworthiness is a claim under general maritime law based on the vessel owner's
27   duty to ensure that the vessel is reasonably fit to be at sea." *Lewis*, 531 U.S. at 441.

28          [12] *See supra* note 9.

27

1    circumstances," the plaintiffs were entitled to a jury trial over the *in rem* admiralty claim as well.

2    *Id.* at 1057.

3            The Fourth Circuit reached a similar conclusion in *Vodusek v. Bayliner Marine*

4    *Corp.*, 71 F.3d 148 (4th Cir. 1995), a decision the Ninth Circuit cited with approval in *Ghotra*,

5    113 F.3d at 1056–57.  In *Vodusek*, the plaintiff's husband died after the explosion of his 28-foot

6    cabin cruiser.  71 F.3d at 151.  She asserted several negligence and products liability claims

7    against the manufacturer and retailer.  *Id.*  She invoked diversity jurisdiction against the

8    manufacturer and admiralty jurisdiction against the retailer, who was not diverse, and demanded a

9    jury trial on all claims.  *Id.* at 151–52.  In an abundance of caution, the district judge conducted

10   both a jury trial and a bench trial.  *Id.* at 152.  On appeal, the defendants argued that because

11   diversity was incomplete and "admiralty cases are traditionally tried to the bench," "the court was

12   not required to submit the case to the jury."  *Id.*  The Fourth Circuit disagreed.  It relied on

13   *Fitzgerald* and noted all the claims arose from one boating accident and led to the same injuries.

14   *Id.* at 153–54.  Because the plaintiff could have litigated separate diversity and admiralty cases

15   against each defendant, the parties' lack of complete diversity was not fatal to federal diversity

16   jurisdiction.  *Id.*

17           Both the *Ghotra* and *Vodusek* courts rejected a contrary doctrine growing out of

18   *Powell v. Offshore Navigation, Inc.*, 644 F.2d 1063 (5th Cir. 1981).  In *Powell*, the court held that

19   non-diverse defendants with no other basis for jurisdiction left the district court with only

20   admiralty jurisdiction.  *Id.* at 1070–71.  It therefore affirmed the district court's decision that

21   plaintiffs had no right to a jury trial.  *Id.*  In the Ninth Circuit's estimation, *Powell* "unnecessarily

22   constrain[ed] the flexibility created by the unification of the historically separate departments of

23   'law' and admiralty by the Federal Rules of Civil Procedure . . . ."  *Ghotra*, 113 F.3d at 1057.

24   Moreover, as a general matter, the liberal federal rules on joinder "'permit legal and equitable

25   causes to be brought and resolved in one civil action and preserve any statutory or constitutional

26   right to a jury trial.'"  *Id.* (quoting *Wilmington Trust v. U.S. Dist. Court for Dist. of Haw.*, 934

27   F.2d 1026, 1031 (9th Cir. 1991)).  "All of the circuits that have addressed the issue have

28   concluded that, under *Fitzgerald*, admiralty claims may be tried to a jury when the parties are

1  entitled to a jury trial on the non-admiralty claims." *Luera v. M/V Alberta*, 635 F.3d 181, 192

2  (5th Cir. 2011).  Citing *Ghotra* and *Vodusek*, the Fifth Circuit has also held more recently that

3  "the mere presence of admiralty claims in the same complaint as claims premised on diversity

4  jurisdiction does not preclude a jury trial."  *Id.* at 190–93 & n.7 (5th Cir. 2011) (distinguishing

5  *Powell* because in that case, the plaintiff had invoked only the court's admiralty jurisdiction).

6        These differing circuit decisions appear to reflect the Federal Rules' flexibility in

7  the face of potentially duplicative jury and bench trials, especially when each verdict would be

8  logically entangled with the other.  Here no party has described any looming duplication of effort

9  or how two trials could occur.  This case resembles more straightforward admiralty cases tried

10  without a jury.  *See, e.g.*, *Prince v. Thomas*, 25 F. Supp. 2d 1045 (N.D. Cal. 1997) (exercising

11  original jurisdiction over maritime tort claims regardless of diversity, trying the case without a

12  jury).  Without a clear limiting principle, finding this case appropriate for a jury would imply any

13  maritime negligence case in federal court must be sent to the jury.

14        At the same time, in this light, *Fitzgerald*, *Ghotra* and *Vodusek* also stand for a

15  more fundamental proposition: admiralty's bench-trial tradition may yield when law and

16  admiralty conflict and when state and federal maritime jurisdiction are concurrent.  *See Lewis*,

17  531 U.S. at 455.  The Morenos' original case was filed in state court and included only state-law

18  claims.  The United States, now dismissed, made the case federal by removal.[13]  Critically, the

19  Morenos' election to proceed in admiralty is revocable.  *Trentacosta*, 813 F.2d at 1560.  Were

20  they allowed leave to amend and revoked their election, this court could retain jurisdiction of the

21  Morenos' newly declared "at-law" claims as a matter of discretion, *see* 28 U.S.C. § 1367; *Acri v.*

22  *Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc), or even diversity if so alleged.

23  Although Ross Island now seeks a bench trial, it answered the amended complaint with a demand

24

25

26

27

28

---

[13] Ross Island argued at the hearing this case would have been removable even without the United States.  The majority of federal courts disagree.  *See Boudreaux v. Global Offshore Res., LLC*, No. 14-2507, 2015 WL 419002, at *3 (W.D. La. Jan. 30, 2015) (collecting cases to delineate the split, noting the majority has held maritime cases are not removable, and siding with that majority).  District courts in this circuit agree with this majority view.  *See Bartman v. Burrece*, No. 14-0080, 2014 WL 4096226, at *4 (D. Alaska Aug. 18, 2014); *Coronel v. AK Victory*, 1 F. Supp. 3d 1175, 1188 (W.D. Wash. 2014).

1    for a jury trial on its counterclaims.  Answer 6, ECF No. 32 (citing Fed. R. Civ. P. 38).  These

2    unique circumstances, in their totality, serve as a sufficient limiting principle and weigh in favor

3    of a jury trial here, a result no "statute of Congress or Rule of Procedure, Civil or Admiralty

4    forbid[s]." *Fitzgerald*, 374 U.S. at 20.[14]

5          B.    Maritime Negligence

6                The Morenos have invoked this court's admiralty jurisdiction, so the question of

7    Ross Island's negligence is one of federal maritime law.  *Pope and Talbot v. Hawn*, 346 U.S. 406,

8    409–10 (1953); *White v. Sabatino*, 526 F. Supp. 2d 1143, 1156–57 (D. Haw. 2007).  Federal

9    maritime law sweeps in court decisions, congressional enactments, and international conventions

10   and treaties.  *Prince*, 25 F. Supp. 2d at 1047.  Although it resembles common law, "[t]he

11   common-law duties of care have not been adopted and retained unmodified by admiralty, but

12   have been adjusted to fit their maritime context." *Norfolk Shipbuilding & Drydock Corp. v.*

13   *Garris*, 532 U.S. 811, 815 (2001).

14               In general, maritime law "imposes duties to avoid unseaworthiness and

15   negligence," and injuries a defendant causes by breach of those duties are compensable.  *Id.*

16   at 813.  The elements of a maritime negligence tort are duty, breach, causation, and damages.

17   *Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948, 953 (9th Cir. 2011).  In more expansive

18   terms, "'a plaintiff must establish the following elements: (1) the defendant was under a duty to

19   the plaintiff to use due care; (2) the defendant breached that duty; (3) the plaintiff suffered

20   damages; and (4) the breach of the duty proximately caused the plaintiff's damages.'" *Caputo v.*

21   *Holland Am. Line, Inc.*, No. 09-1096, 2010 WL 2102820, at *2 (W.D. Wash. May 25, 2010)

22   (quoting Charles M. Davis, *Maritime Law Deskbook* 139 (2010)).  The doctrine of comparative

23   fault applies to federal maritime negligence claims.  *See United States v. Reliable Transfer*

24   *Company*, 421 U.S. 397, 411 (1975) ("[W]hen two or more parties have contributed by their fault

25

26          [14] The court also observes that the traditional justifications for separate admiralty courts
     and admiralty jurisdiction are inapplicable to the circumstances of this case.  Neither party has
27   alerted the court, for example, to any unusually damaging ramifications to maritime commerce
     should a jury trial be conducted in this case.
28

30

1   to cause property damage in a maritime collision or stranding, liability for such damage is to be

2   allocated among the parties proportionately to the comparative degree of their fault . . . .").

3                          1.   Duty and Breach

4           In general, maritime law imposes a standard of "reasonable care under the

5   circumstances."  *See, e.g.*, *Weyerhaeuser Co. v. Atropos Island*, 777 F.2d 1344, 1347 (9th Cir.

6   1985).  The Ninth Circuit has held this standard is "essentially synonymous" with a standard of

7   "human skill and precaution, and a proper display of nautical skill."  *Id.*  In particular, when a

8   moving vessel strikes a stationary object, the collision is termed an "allision," and the law

9   presumes the moving ship is at fault.  *Wardell v. Dep't of Transp., Nat. Transp. Safety Bd.*,

10  884 F.2d 510, 511–12 & n.1 (9th Cir. 1989).  This presumption is commonly referred to as the

11  *Oregon* rule after *The Oregon*, 158 U.S. 186 (1895).  It is a variant of common law *res ipsa*

12  *loquitor*, customized to maritime law: "moving vessels do not usually collide with stationary

13  objects unless the vessel is mishandled in some way."  *Wardell*, 884 F.2d at 512.  The party

14  against whom the presumption applies must disprove his fault by a preponderance of the

15  evidence, not just countervailing evidence, "by showing . . . [1] that the collision was the fault of

16  the stationary object, [2] that the moving vessel acted with reasonable care, or [3] that the

17  collision was an unavoidable accident."  *Id.* at 513.

18          Here, the parties cast their arguments in different terms, but both address these

19  means of rebutting the presumption.  Fundamentally, however, a long list of disputed factual

20  questions prevents resolution in favor of either party on summary judgment.  The parties dispute,

21  for example, whether the water and weather were clear; whether the Baldanzis' boat was the only

22  other boat in the river that day; whether the Morenos were traveling at 45 or 70 miles per hour or

23  at some other speed; what portion of the pipe was floated (or intended to be floated) at the time of

24  the accident; whether the dredge vessel sounded its horn in warning before or after the Morenos'

25  boat struck the pipe; whether Ross Island had marked the pipe's location with white buoys;

26  whether the buoys were clearly visible; where the skiffs patrolled; whether a skiff operator could

27  simultaneously steer, sound the horn, and waive the flag; whether Ross Island gave its skiff

28  drivers guidelines or allowed them to exercise discretion while patrolling; whether Ross Island's

1  sign barges were visible from a distance; whether the barges were anchored near the pipe;

2  whether any of these barges were anchored east of the pipe at the time of the accident; whether

3  the dredger vessel's day shapes were visible from a distance; and whether the Baldanzis would

4  have hit the pipe had the Morenos not first.

5          Aside from disputed questions of pure fact and witness credibility, this case turns

6  on several questions of reasonableness.  Maritime negligence cases are rarely resolved at

7  summary judgment; whether the parties acted reasonably is ordinarily a question for the fact-

8  finder.  *Christensen v. Georgia-Pac. Corp.*, 279 F.3d 807, 813 (9th Cir. 2002); *Ghotra*, 113 F.3d

9  at 1058.  Examples of these reasonableness inquires include whether Ross Island's skiffs were

10 adequate to patrol the pipeline and warn off typical boat traffic; whether the Morenos kept a

11 proper lookout or maintained a proper speed; whether Ross Island kept a proper lookout; whether

12 Ross Island's decision to use sign barges rather than buoys was reasonable; and whether Ross

13 Island's day shapes were a sufficient warning.  The jury could reasonably conclude, for example,

14 after viewing photographs of the accident scene, the river was too wide, the dredge vessel too far

15 south, and the warning signs too ambiguous given the nature of the risk: a mile-long, twenty-inch

16 dredge pipe floating just below the surface.  The jury could instead lend weight to the Deputies'

17 and Mr. Dodd's investigations, which concluded the Morenos did not keep a proper lookout or

18 maintain a safe speed.  If Ross Island's safety measures were unreasonable and the pipe was not

19 reasonably visible, then Ross Island may have been at fault.  On the other hand, if the day shapes,

20 barges, horn blasts, buoys, and skiffs were reasonable and perceptible, then the preponderance of

21 the evidence may weigh against the Morenos, and the presumption against them would stand

22 intact.

23          2.      Causation and the *Pennsylvania* Rule

24          A second unresolved maritime-law doctrine stands in the path of granting either

25 motion.  Both parties argue for application of the so-called *Pennsylvania* Rule against the other.

26 The *Pennsylvania* Rule is a longstanding rule of admiralty law, often applied by the Ninth Circuit,

27 traditionally to "ship collisions and navigational accidents."  *MacDonald v. Kahikolu, Ltd.*,

28

581 F.3d 970, 973–75 (9th Cir. 2009).  The doctrine has its origins in a Nineteenth Century U.S. Supreme Court decision, *The Pennsylvania*, 86 U.S. (19 Wall.) 125 (1873):

> *The Pennsylvania* established a stringent burden of proof for a vessel in violation of a statutory safety requirement.  That case involved the collision between a bark[15] and a steamer in a dense fog.  The bark was not sounding the appropriate fog signals, in contravention of an earlier act of Congress for preventing collisions at sea.  In weighing the fault of the bark, the Supreme Court, Justice Strong writing, said: "[W]hen, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster.  In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.  Such a rule is necessary to enforce obedience to the mandate of the statute."

*Trinidad Corp. v. S.S. Keiyoh Maru*, 845 F.2d 818, 824 (9th Cir. 1988) (quoting 86 U.S. (19 Wall.) at 136) (other citations omitted; alteration in *Trinidad*)).  In short, "if a vessel involved in an accident violated a statute or regulation intended to prevent such an incident, it is presumed that the ship owner was at fault, and the burden of proving causation shifts to the ship owner." *MacDonald*, 581 F.3d at 973.

Although *The Pennsylvania* was decided in the context of a statutory violation, the modern rule applies just as well to regulatory violations, provided the statute or regulation is intended to prevent the type of incident in question.  *See id.*  The rule concerns itself with causation only.  *See id.* at 975 n.7.  After it is established that the rule applies, the violator may show its actions "could not have been" a cause of the collision and so escape the rule's presumption.  *Trinidad*, 845 F.2d at 824.  The Ninth Circuit "has interpreted the phrase 'could not have been' . . . to mean that 'where a ship at the time of a collision is in violation of a statutory rule intended to prevent collisions, the burden of proof rests upon her to establish that the violation could not reasonably be held to have been a proximate cause of the collision.'"

---

[15] A bark (or alternatively barque or baquentine) is a "sailing ship of three or more masts with the affmost mast fore-and-aft rigged and the others square-rigged." Merriam Webster's Dictionary, *available at* http://www.merriam-webster.com/dictionary/bark.  *See also* Oxford English Dictionary, "bark, barque," available at http://www.oed.com/view/Entry/15568#eid27315691 ("A small ship; in earlier times, a general term for all sailing vessels of small size").

1    *Trinidad*, 845 F.2d at 824 (quoting *States S.S. Co. v. Permanente S.S. Corp.*, 231 F.2d 82, 87 (9th

2    Cir. 1956)).  The violating party may rebut the presumption of cause only "by a clear and

3    convincing showing of no proximate cause."  *Id.* at 825.  Even when the *Pennsylvania* Rule

4    applies, a party may avoid summary judgment by pointing to any genuine dispute about the

5    other's partial liability, even if one party "was significantly more at fault for the accident" than

6    the other.  *Holzhauer v. Golden Gate Bridge Highway & Transp. Dist.*, No. 13-02862, 2015 WL

7    628255, at *3 (N.D. Cal. Feb. 12, 2015) (citing, *inter alia*, *Reliable Transfer*, 421 U.S. 397, and

8    *Cliffs-Neddrill Turnkey Int'l-Oranjestad v. M/T Rich Duke*, 947 F.2d 83, 87 (3d Cir. 1991)).

9             Here, both Ross Island and the Morenos argue the other violated one of several

10   provisions of the Federal Rules of Inland Navigation.  These are the "'rules of the road' for

11   proper navigation based on long-standing principles and were intended to prevent collisions in

12   inland waterways."  *Mike Hooks Dredging Co. v. Marquette Transp. Gulf-Inland, L.L.C.*,

13   716 F.3d 886, 891–92 (5th Cir. 2013).  Federal courts commonly apply the *Pennsylvania* Rule to

14   collisions arising from violations of the Inland Rules of Navigation.  *See, e.g.*, *Youngberg v.*

15   *McKeough*, No. 10-916, 2012 WL 555042, at *4 (W.D. Mich. Feb. 21, 2012), *aff'd*, 534 F. App'x

16   471 (6th Cir. 2013).  Ross Island charges the Morenos with violations of Rules 5 (proper

17   lookout), 6 (safe speed), 7 (avoiding collisions), and 18 (right of way).  The Morenos argue Ross

18   Island did not obey Rules 5 and 27(d) (special rules for dredge vessels) in light of the

19   circumstances and general provisions of Rule 2.

20                    a)      Rule 5: Proper Lookout

21             Rule 5 requires a proper lookout.  *See* 33 CFR § 83.05 ("Every vessel shall at all

22   times maintain a proper look-out by sight and hearing as well as by all available means

23   appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the

24   situation and of the risk of collision.").  Failures to keep a proper lookout may trigger the

25   *Pennsylvania* Rule.  *See Moran Towing & Transp. Co. v. City of New York*, 620 F.2d 356, 358

26   (2d Cir. 1980).  A lookout may be adequate even though he has other duties, *Capt'n Mark v. Sea*

27   *Fever Corp.*, 692 F.2d 163, 166 (1st Cir. 1982), especially when the vessel is small, *Andrews v.*

28   *United States*, 801 F.2d 644, 650 (3d Cir. 1986); *Holzhauer*, 2015 WL 628255, at *4.  The duty to

34

1    keep a lookout may also fall on a passenger.  *See, e.g.*, *Weissman v. Boating Magazine*, 946 F.2d

2    811, 814 (11th Cir. 1991).

3              As expected from a Rule referring to "the prevailing circumstances" and "full

4    appraisal of the situation," whether a lookout was adequate is usually a question for trial.  *Cliffs-*

5    *Neddrill*, 947 F.2d at 89.  That is true here.  Whether Michael and Jared kept a proper lookout by

6    looking forward, even though they were speaking to one another, depends on the condition of the

7    water, weather, visibility, and traffic, both on that day and other days, on the boat's speed, and

8    depends even on whether Jared offered navigation advice.  *See Holzhauer*, 2015 WL 628255, at

9    *5 ("[The passenger] testified at deposition that he suggested that Decedent could make a U-turn

10   on the water immediately prior to the collision.  [He] also directed [the driver] throughout the

11   trip." (record citations omitted)).  Whether Ross Island's lookouts were proper depends similarly

12   on the circumstances, including the river's size, the skiffs' and dredge vessel's positions on the

13   river, and the pipe's location.  These questions are improper for resolution here.

14              b)       Rule 6: Safe Speed

15              Rule 6 requires a safe speed.  33 C.F.R. § 83.06 ("Every vessel shall at all times

16   proceed at a safe speed so that she can take proper and effective action to avoid collision and be

17   stopped within a distance appropriate to the prevailing circumstances and conditions.").

18   Violations of Rule 6 may trigger the *Pennsylvania* Rule.  *Sterling Equip., Inc. v. M/T Great E.*,

19   52 F. Supp. 3d 76, 83 (D. Mass. 2014); *In re Backcountry Outfitters, Inc.*, No. 06-234, 2008 WL

20   516792, at *7–8 (N.D. Fla. Feb. 22, 2008); *Maritime & Mercantile Intern. L.L.C. v. U.S.*, No. 02-

21   1446, 2007 WL 690094, at *22–23 (S.D.N.Y. Feb. 28, 2007).  Whether a vessel's speed is safe is

22   also a factual question.[16]  *See Bernert Towboat Co. v. USS Chandler (DDG 996)*, 666 F. Supp.

23   _____

24              [16] The Rule's language alone leads to this conclusion:

         In determining a safe speed the following factors shall be among those taken into
25       account:

26       (a) By all vessels: (i) The state of visibility; (ii) The traffic density including
         concentration of fishing vessels or any other vessels; (iii) The maneuverability of
27       the vessel with special reference to stopping distance and turning ability in the
         prevailing conditions; (iv) At night, the presence of background light such as from
28       shore lights or from back scatter of her own lights; (v) The state of wind, sea, and

                                                35

1454, 1460 n.2 (D. Or. 1987) (considering the vessel's size, speed, the channel's width and characteristics, the amount of traffic in the channel, the presence of people on the shores, and whether speed could avoid danger).

Here, whether the Morenos' speed was safe cannot be resolved on summary judgment. The parties dispute the conditions of the water, visibility, traffic, and other circumstances. River traffic is not normally subject to a speed limit near where the accident occurred, and one of the investigating Sheriff's Deputies agreed in deposition it was "typical that [boaters] drive at a high rate of speed" and that forty-five or fifty miles per hour could be a reasonable speed. *See* Pls.' UMF no. 41; Guthrie Dep. 49:12–50:2. At the same time, Michael Moreno knew heavy equipment was common in the river, Def.'s UMF no. 38, and had seen idle dredging equipment in the river in the past, *id.* no. 39. And the Sheriff's Deputies and Mr. Dodd concluded Mr. Moreno's speed was too high for the conditions. *Id.* nos. 46–48, 52.

c)    <u>Rules 7 and 18: Collisions and Right of Way</u>

Rule 7 requires boat operators to avoid collisions. 33 C.F.R. § 83.07(a) ("Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist."). Rule 18 requires power-driven vessels "keep out of the way" of vessels "not under command" or "restricted in her ability to maneuver." *See id.* § 83.18(a). Here, again, the outcome is too sensitive to the resolution of outstanding factual disputes and depends on unresolved questions of reasonableness.

---

current, and the proximity of navigational hazards; (vi) The draft in relation to the available depth of water.

(b) Additionally, by vessels with operational radar: (i) The characteristics, efficiency and limitations of the radar equipment; (ii) Any constraints imposed by the radar range scale in use; (iii) The effect on radar detection of the sea state, weather, and other sources of interference; (iv) The possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range; (v) The number, location, and movement of vessels detected by radar; (vi) The more exact assessment of the visibility that may be possible when radar is used to determine the range of vessels or other objects in the vicinity.

1                  d)       Rules 27 and 2: Day Shapes and Special Circumstances

2          The parties agree Rule 27 applies to Ross Island's dredge vessel, and the Morenos

3 concede that Ross Island's dredge technically complied with Rule 27 by displaying certain

4 shapes. Def.'s UMF no. 7. But the Morenos argue the special circumstances of the dredging

5 operation required more than technical compliance. Rule 27 describes certain mandatory lights

6 and day shapes for dredge vessels. *See id.* § 83.27(d).[17] Rule 2 lists two provisos applicable to all

7 the Rules, including Rule 27: First, "[n]othing in these Rules shall exonerate any vessel, or the

8 owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules

9 or of the neglect of any precaution which may be required by the ordinary practice of seamen, or

10 by the special circumstances of the case." *Id.* § 83.02(a). Second, "[i]n construing and

11 complying with these Rules due regard shall be had to all dangers of navigation and collision and

12 to any special circumstances, including the limitations of the vessels involved, which may make a

13 departure from these Rules necessary to avoid immediate danger." *Id.* § 83.02(b).

14          The District of Massachusetts has twice concluded that a violation of Rule 2 "does

15 not stand as a statutory rule the violation of which would provide a basis for invoking the

16 *Pennsylvania* Rule's burden shifting regime." *Sterling Equip.*, 52 F. Supp. 3d at 83 (citing *In re*

17 *Alex C Corp.*, No. 00-12500, 2010 WL 4292328, at *7 n.14 (D. Mass. Nov. 1, 2010)). It

18 reasoned the Rule is merely "a precatory statement," meant to guarantee the Rules of Inland

19 Navigation do not supplant maritime custom and practice, and were the *Pennsylvania* Rule

20 triggered by Rule 2, then "it would apply in almost every maritime case." *Id.* Other courts have

21 concluded the particular circumstances of an accident may prevent summary judgment despite

22 established rule or custom, citing Rule 2. *See, e.g.*, *Slatten, LLC v. Royal Caribbean Cruises Ltd.*,

23 No. 13-673, 2014 WL 4186781, at *5 (E.D. La. Aug. 22, 2014) (citing Rule 2 and concluding,

24 "Although the Inland Navigation Rules generally put the responsibility for safe passage on the

25 overtaking vessel, the Court finds that there is a genuine triable issue whether the [vessel in

26

27 ———————————————

28         [17] *See supra* note 4.

question] assumed partial responsibility for the passage by selecting the location for it and by offering to slow down.").

Here, the court finds Ross Island's compliance or not with Rule 2 may give rise to a triable question of fact. The dredge vessel's day shapes were arguably distinguishable only from the north and south at the time of the accident, but boat traffic was approaching from the east and west. A reasonable fact-finder could conclude the river was too wide, the pipe's pathway too irregular, and the dredging ship's orientation too variable. But the same fact-finder could conclude Ross Island's additional precautions – the skiffs, barges, and buoys – were appropriate for these special circumstances. Because both conclusions are reasonable, the case is inappropriate for summary judgment.

### 3. Damages

The Morenos reserve a determination of damages for trial. Pls.' Mot. 1. Ross Island does not address the existence or magnitude of any damages except to object to their characterization as "severe." *See* Pls.' UMF no. 48. Summary judgment on damages is inappropriate here in any event because the finder of fact could reasonably conclude Ross Island and the Morenos are both partially at fault and reduce any damages award accordingly. *See Reliable Transfer Co.*, 421 U.S. at 411.

### C. Negligent Infliction of Emotional Distress

"General maritime law of the United States governs claims of negligent infliction of emotional distress in suits brought under the federal courts' admiralty jurisdiction." *Tassinari v. Key W. Water Tours, L.C.*, 480 F. Supp. 2d 1318, 1320 (S.D. Fla. 2007) (citing, *inter alia*, *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1409 (9th Cir. 1994) ("We see no reason to disallow meritorious emotional distress claims under the general maritime law . . . .")). The Supreme Court has described the applicable standard. *Stacy v. Rederiet Otto Danielsen, A.S.*, 609 F.3d 1033, 1035 (9th Cir. 2010) (citing *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 547–48 (1994)).

1    Ross Island's motion for summary judgment applies California law to this claim

2  and is entirely derivative of the balance of its motion.  *See* Def.'s Mot. 17.  The motion is

3  therefore denied.

4  VI.    <u>CONCLUSION</u>

5    (1) The parties' requests for judicial notice, ECF Nos. 95, 97-2, 102, are

6  GRANTED IN PART as described in this order.

7    (2) The Morenos' motion for summary judgment, ECF No. 94, is GRANTED IN

8  PART to the extent it is construed as a motion under Federal Rule of Civil Procedure 39, to allow

9  this case to be tried to a jury.  In all other respects the motion is DENIED.

10    (3) Ross Island's motion for summary judgment, ECF No. 97, is DENIED.

11    (4) Ross Island SHALL FILE within seven days, if possible, an affidavit of Wes

12  Dodd, affirming under oath the statements made in his report at ECF No. 78.

13    This order resolves ECF Nos. 94 and 97.

14    IT IS SO ORDERED.

15   DATED:  September 23, 2015.

16

17  _____

18  UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28